**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **JANE S. MIZE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 08-0645-CG-C** |
| | ) | |
| **CENTURA FINANCIAL SERVICES** | ) | |
| **(RBC),** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

On October 31, 2008, pro se plaintiff Jane S. Mize ("Mize") brought a lawsuit against

RBC Bank (USA) ("RBC")[1] claiming RBC violated the Americans with Disabilities Act

("ADA") and the Age Discrimination in Employment Act ("ADEA") when it failed to accept her

proposed accommodations for her alleged disabilities and terminated her on the basis of her

alleged disabilities and age.(Doc. 1).[2]  On December 9, 2008, RBC filed an answer to Mize's

---

[1] In her complaint, Mize misidentified RBC as Centura Financial Services (RBC).

[2] In her response to the motion for summary judgment, Mize refers to the denials of her
requests as evidence of a "hostile work environment." (Doc. 18-1, p. 3-5).  In this case, Mize is
proceeding pro se, thus "a complaint submitted by a pro se plaintiff should be held to a less
stringent standard than that submitted by an attorney, and should be construed as alleging all
fairly and reasonably inferred claims."  Tigner v. Internal Revenue Serv., 2000 WL 641614, at
*1 (N.D.Ga. Mar. 24, 2000)(citing Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30
L.Ed.2d 652 (1972)).  However, "even a pro se litigant must allege the essential elements of the
claims for relief, and vague and conclusory allegations are insufficient to state a claim."
Id.(citing Richards v. Harper, 864 F.2d 85, 87 (9th Cir. 1988)).  In this case, Mize did not supply
in her complaint the essential elements of a "hostile work environment" claim nor provide the
facts necessary to establish such a claim.  As a result, this court finds that Mize has not properly
pled a "hostile work environment" claim thus, to the extent that Mize believes she has pled this
claim, the "hostile work environment" claim is dismissed.

complaint. (Doc. 6).  This matter is now before the court on RBC's Motion for Summary

Judgment (Docs. 13-15), Mize's Response to the Motion (Doc. 18), and RBC's Reply to Mize's

Response (Doc. 23).  For the reasons stated below, the Motion for Summary Judgment is due to

be granted.

**FACTS**

Mize, who is over the age of 40, asserts she suffers from fibromyalgia, asthma, scoliosis,

high blood pressure and hypothyroidism.  (Doc. 15, p. 1; Doc. 18-1, p. 1 & Ex. 1; Doc. 14, Ex.A,

Mize Dep., pp. 67, 95-6, 117, 126, 159).  She maintains she has endured constant pain in her

back, hands, arms, legs, and feet since the early-to-mid 1990s.  (Doc. 14, Ex.A, Mize Dep., pp.

59-60, 67-70) and that she has not had a pain-free day since that time.  (Id., p. 69).  Mize testified

that the pain associated with the fibromyalgia prevents her from cooking and having a social life,

and it limits her ability to clean all of her house in one try.  (Id., p. 119-20).  She also asserts that

the pain from her ailments also limits her sleeping, walking at length, climbing, turning quickly,

heavy lifting, standing quickly, kneeling at length, and breathing normally.  (Doc. 18-1, pp. 1-2;

Doc. 18-3, Exhibit 1; Doc. 18-4, Exhibit 2).  Mize also argues she suffers from "night blindness"

which makes her reluctant to drive in unfamiliar places at night.  (Doc. 14, Ex.A, Mize Dep., pp.

95-6).

Mize was employed by RBC from March 10, 2007 until February 15, 2008 at RBC's

Hillcrest Branch bank building in Mobile, Alabama.  (Doc. 14, Ex. A, Mize Dep., Ex. 22 & Ex.

C, Herman Decl., ¶ 2; Doc. 1, p. 3; Doc. 18-1, ¶ 2).  During that time, Amber Herman

("Herman") was the branch manager.  (Doc. 14, Ex. C, Herman Decl., ¶ 2).  Prior to her

employment with RBC, Mize worked for AmSouth Bank ("AmSouth"), RBC's predecessor,

also at the Hillcrest Branch bank building.  (Doc. 1, p. 2; Doc. 14, Ex.A, Mize Dep., Ex. 22).

The Hillcrest Branch bank building is located on a slight hill.  The main level contains a teller

line, a drive-thru window, the relationship banker's desk, and manager's offices.  The basement

contains the safety deposit vault and a walk-up teller window that AmSouth took out of service

approximately six months prior to RBC's takeover.  The basement is accessible by way of a back

door that faces the parking lot on the backside of the building and is also accessible from the

building's main level by way of a stairwell.  (Doc. 14, Ex. A, Mize Dep., pp. 160-4, 243-4).

     While working for AmSouth, Mize worked alone in the basement under the position title

of Vault Custodian.  As Vault Custodian, she was responsible for opening and closing safety

deposit box accounts, auditing these account to ensure that customer fee payments were current,

granting access to the boxes, and occasionally inventorying the boxes.  (Id., pp. 115-6, 221-2,

226).  When it took over the Hillcrest Branch in February 2007, RBC offered and Mize accepted

employment with RBC as a Customer Assistance Representative ("CAR").  (Id., Ex. 22).

Herman described the responsibilities of a CAR as follows:

> Generally, a CAR serves as a general customer service resource and is required to work
> in the branch's main foyer area, known as "the platform," greeting customers, directing
> them to bankers, and answering questions about account options, among other things.
> CARs are also expected to fill-in as tellers as required by their manager, and they are
> available to work other jobs, depending on their individual branch's needs.  [As a CAR,]
> I anticipated that Ms. Mize would work approximately twenty percent (20%) of her
> working time in the basement, forty percent (40%) on the platform, and forty percent
> (40%) as a teller serving drive-thru and walk-in customers.

> (Id., Ex. C, Herman Decl., ¶ 3).

Mize acknowledged that as a CAR, she would have to "function in the [t]eller capacity as

required by [her] manager."  (Doc. 14, Ex. A, Mize Dep., Ex. 7).  However, when Mize began

work for RBC on March 10, 2007, Herman did not immediately require Mize to perform all of

the duties described above including working as a teller. (Id., ¶ 4).

In April 2007, Mize asked Melissa Bettis ("Bettis"), who was the Senior Relationship Banker and the manager of the Hillcrest Branch in Herman's absence, and Tammy Hill ("Hill"), who was the Customer Care Manager of the Hillcrest Branch and Mize's immediate supervisor, to answer her telephone for a few hours when she was attempting to reach Herman to discuss an unrelated issue, a request which was denied by both Bettis and Hill.  (Id., Ex.A, Mize Dep., pp. 188-90; Doc. 18-4, Ex. 4).  Mize asserts that this was not a request for an accommodation for her disability, rather "[t]his was simply [a] request from employee to acting branch manager and her immediate supervisor for a little help while she was able to reach the branch Manager."  (Doc. 18-1, ¶ 6).

Shortly thereafter, Herman asked Mize to inventory the safety deposit boxes, a task which she had previously performed while working for AmSouth.  (Doc. 14, Ex.A, Mize Dep., pp. 251-2, 255-7, 262-3; Doc. 14, Ex. C, Herman Decl. ¶ 10).  This inventory project would require Mize to climb a ladder or kneel down to access some of the boxes.  (Doc. 14, Ex. A, Mize Dep., p. 256).  Mize asked Herman to provide another employee to help with this project because Mize maintained she could not be on ladder or kneel down for an extended period of time.  (Id. at p. 257-9, 255).  Herman denied Mize's request, but she did direct some of the upstairs tellers to sort out paperwork associated with the inventory "during any 'down time' that they had between their interactions with customers."  (Id. at pp. 257-8; Ex. C, Herman Decl. ¶ 10).  Herman asserts the reason that she denied Mize's request was that "no other personnel [was] available that [she] could divert away from their normal jobs upstairs to work for a prolonged period of time in the basement."  Since "[she] was aware that the inventory project

4

could take weeks to complete", she concluded that "there simply was not an employee available to dispatch to the basement for an extended period." (Id., Ex. C, Herman Decl. ¶ 10). Mize ultimately completed the inventory project, though she maintains it was done "with great discomfort, pain, a few tears and tremendous stress." (Id., Ex. A, Mize Dep. p. 263; Doc. 18-2, Mize Decl., ¶ 10).

Around the same time, Mize noticed that some of the employees continued an AmSouth practice of leaving work early one day a week. (Doc. 14, Ex. A, Mize Dep., pp. 165, 168, 177-8). Mize asked Herman if she could also have an early day like the other employees, but instead of granting Mize's request, Herman told all branch employees that RBC would not honor AmSouth's policy and that no employees were permitted to leave early without approval. (Id., pp. 168, 177-8). Mize thereafter felt that the other employees resented her for telling Herman about the practice of leaving early one day a week. (Id., pp. 179, 181-2). In fact, Mize stated that on one occasion, a teller told her that all the other tellers were angry with her because of it. (Id., 185-7, 192).

Also around the same time, RBC management designated Mize the "privacy champion" of the Hillcrest Branch. (See Doc. 18-4, Ex. 5). As the "privacy champion," Mize was required to ensure that all documents with confidential customer information, such as bank account and social security numbers, were securely stored. Part of this job required Mize to walk around the branch building two or three times a day to make sure that no such documents were inadvertently left on a copy machine, visible to the public on a computer screen, or located where customers or after-hours janitors could view them. (Doc. 14, Ex.A, Mize Dep., pp. 176-178-80). In Mize's opinion, she did a good job as privacy champion and overcame any troubles that arose while

5

performing her responsibilities. (See Id., pp. 178-9, 191).  Mize also asserts that she faced

problems from the other employees with her duty as privacy champion.  She felt that because she

had "complained about the early days" that the other employees were taking off and those days

"were taken away from everyone," everyone "resented" her, thus "when [she] would go upstairs

to check on what [she] was supposed to do as privacy champion, [the other employees] made it

very hard for me to do [her] job."[3]  (Id. p. 179).  Other than the above problems, Mize testified

that she had no trouble with her responsibilities as privacy champion.  (Id., pp. 178, 191).

On Friday, December 7, 2007, the Hillcrest Branch held its annual Christmas Party at

Herman's house. (Id., pp. 331-41 & Ex. 4).  Herman sent an email to Mize on that day asking

"[d]id you say you were picking up the dressing?"  Mize responded by email as follows:

> Amber,
>
> I am not even sure I am coming.  I hate to tell you this but after dark I am afraid to drive if I am not sure where I am going.  I have night blindness and I have driven off the road several times when a car approaches me with bright headlights on.  If I could follow someone (I have been trying to finish this, I have been swamped with customers) to your house that would be great or catch a ride, but I don't want to impose on any one.  Anyway, I could pick up the dressing early and give it to someone.  I am willing to do whatever you need."

Herman immediately responded by email that "Tony [White] said he was going to get it - we just

wanted to make sure you both weren't planning to get it. That is just fine."  (Id., Ex. 4).  Mize

interprets this email exchange as Herman telling her that "nobody is going to help [her]" after

she made a request for reasonable accommodation, but she also admitted that "a reasonable

---

[3] For example, Mize found a confidential document left on a copy machine by Bettis, and upon discovering said document, Mize placed it in Bettis' desk drawer with a note reminding her of her duty to not leave anything with confidential information on the copy machine. In response, Bettis left a note on Mize's desk that stated "mind your own business."  (Id., pp. 183-4).

person could also read [the email exchange] and not interpret it as a reasonable accommodation. (<u>Id.</u>, pp. 335-6, 341).  Besides this email exchange, Mize did not ask Herman or any other employee to follow or ride with them to the Christmas party.  (<u>Id.</u>, pp. 336-8).

In January or early February 2008, Herman informed Mize in a meeting that her job responsibilities would be changing, but Herman did not describe the new responsibilities.  When told this, Mize maintained she "looked forward to having more duties."  (<u>Id.</u>, pp. 214-16).  On or about February 8, 2008, Herman had a second meeting with Mize where she specified what her new job responsibilities would be.  Herman informed Mize that she would have three duties as a CAR: (1) working the platform, which includes opening accounts and CD's and taking loan applications; (2) filling in at the teller window when the other tellers went to lunch; and (3) performing the duties she used to perform as vault custodian.  (<u>Id.</u>, pp. 217-19, 228; Ex. 5).

After Herman described these additional duties, Mize told Herman that she could not "work the teller line."  (<u>Id.</u>, p. 219).  In response, Herman asked "what are you going to do?" to which Mize replied "well, I guess I'll have to quit."  Herman then asked for Mize's resignation letter, to which Mize said "okay, I'll type it up and give it to you."  However, a couple of days later, Herman sent Hill to retrieve the resignation letter, and Mize told Hill that she had changed her mind and that she was not going to resign. (<u>Id.</u>, pp. 228-9).

On February 11, 2008, Herman and District Manager Michelle Hand ("Hand") met with Mize in Herman's office.  (<u>Id.</u>, pp. 270-71).  In that meeting, Herman and Hand told Mize that February 15, 2008 would be her last day unless she accepted all her responsibilities as CAR, including at times working as a teller on the main floor for an entire day.  (<u>Id.</u>, Ex. C, Herman Decl. ¶¶ 6 & 8; Doc. 18-2, Mize Decl., ¶ 6).  Mize told them that she would perform all the CAR

duties except working the main level teller desk because she maintained that she would need to keep both feet on the ground in order to alleviate the pain in her back and that the elevated bar-stool-type chairs used by the main level tellers prohibited her from doing this.  (Doc. 14, Ex.A, Mize Dep., pp. 237-9, 242).  As an alternative, she proposed working the teller desk in the basement, a desk which did not require an elevated stool but had been out of service since at least six months before RBC took over the Hillcrest Branch and was not reopened by RBC.  (Id., pp. 242-44, 253-55).  Herman did not accept Mize's proposed accommodation.  (Id., Ex. C, Herman Decl., ¶ 6).

On that same day, Mize returned to the basement with a customer, where she became faint, almost passed out, and had to lean against a wall to prevent herself from falling on the floor.  The customer witnessed Mize's distress and summoned help from upstairs.  Herman, Bettis, and Hill went to the basement and asked to see the medication that Mize was taking.  (Id., pp. 267-9).  Herman thereafter gave Mize permission to take the rest of the day off.  (Id., p. 235).  Mize asserts that she felt embarrassed by the incident, particularly by the fact that Herman, Bettis, Hill and the customer had looked at her medicine bottles.  (Id., p. 269-70; Doc. 18-2, Mize Decl., ¶ 7).

After the incident on February 11, 2008, Mize maintains that she was "unable to work." (Doc. 14, Ex.A, Mize Dep., p. 253).  On February 12, 2008, she called in sick and visited her personal doctor.  (Id., Ex. 9; Id., Ex. C, Herman Decl., ¶ 7; Doc. 18-2, Mize Decl., ¶ 7).  The doctor later opined that Mize could not work indefinitely either with or without accommodation and could not surmise when she would be able to return to work.  (Doc. 14, Ex.A, Mize Dep., Ex. 9; pp. 293-5).  On February 13, 2009, Mize again called in sick and thereafter requested an

8

application for disability benefits.  (<u>Id.</u>, Ex. C, Herman Decl., ¶ 7; Doc. 18-2, Mize Decl., ¶ 7).

She was approved for short-term disability but, a few days later, received a letter from the

insurance company stating she would no longer receive short-term disability because RBC had

terminated her employment.  (Doc. 18-2, Decl., ¶ 7).  On February 15, 2008, Herman called

Mize and told her not to come back to work.  (Doc. 14, Ex.A, Mize Dep., pp. 266-7; <u>Id.</u>, Ex. C,

Herman Decl. ¶ 8).  After plaintiff was terminated, RBC filled the CAR position with another

Hillcrest Branch employee. (<u>Id.</u>, Ex. C, Herman Decl. ¶ 8).  Mize asserts this employee was

Tiffany Denbow, whose age was 23.  (Doc. 18-2, Mize Decl., ¶ 9).

## LEGAL ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."   The trial court's function is not "to

weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).   "The mere

existence of some evidence to support the non-moving party is not sufficient for denial of

summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury

to return a verdict for that party.'" <u>Bailey v. Allgas, Inc.</u>, 284 F.3d 1237, 1243 (11th Cir. 2002)

(quoting <u>Anderson</u>, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted." <u>Anderson</u>, at 249-250. (internal citations

omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir.1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e) "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)

10

(citation omitted).  "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

## B. ADA Claim

Under the ADA, an employer shall not discriminate "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To resolve a claim of disability discrimination under the ADA, this court must apply the burden shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000).  To establish a prima facie case of discrimination under the ADA for disparate treatment/termination, a plaintiff must demonstrate that (1) he or she has a disability; (2) he or she is a qualified individual; and (3) he or she was subjected to unlawful discrimination as a result of his disability.  Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1226 (11th Cir. 1999)(citing Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1132 (11th Cir. 1996); Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996)).  If a plaintiff is able to establish her prima facie case, the burden then shifts to the defendant to come forward with a legitimate, nondiscriminatory reason for failing to provide the requested accommodations.  If the employer meets this burden of production, the employee may still prove disparate treatment, for instance, by demonstrating the employer's reason is pretextual.  Raytheon Co. v. Hernandez, 540

U.S. 44, 49 n.3, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003).

Furthermore, "Congress has imposed upon employers the duty to provide reasonable accommodations for known disabilities unless doing so would result in an undue hardship to the employer." Gordon v. E.L. Hamm & Assocs., Inc., 100 F.3d 907, 910 (11th Cir. 1996)(citing 42 U.S.C. § 12112(b)(5)(A)). "In a claim for failure to make reasonable accommodations, the traditional McDonnell-Douglas burden-shifting is modified." Richardson v. Honda Mfg. of Ala., LLC, – F.Supp.2d —, 2009 WL 2171113, at *13 (N.D.Ala. July 22, 2009)(citing Fenney v. Dakota, Minn. & E.R.R. Co., 327 F.3d 707, 712 (8th Cir. 2003)). "In addition to setting forth the prima facie case, [a p]laintiff must identify a reasonable accommodation that would allow him to perform the job." If the plaintiff is able to establish a prima facie case, "the defendant employer may rebut the claim by presenting evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer." Id.(citing Terrell v. USAir, 132 F.3d 621, 624 (11th Cir. 1998)).[4] In the present case, RBC seeks summary judgment as to both of Mize's claims (1) that RBC failed to accept her proposed accommodations for her alleged disabilities and (2) that RBC terminated her on the basis of her alleged disabilities by asserting that Mize cannot establish the elements of her prima facie case as a matter or law.

### 1. Whether Mize has a disability

RBC first argues that Mize cannot establish a claim under the ADA because she does not suffer from a disability for the purposes of the ADA. In order to satisfy this portion of her prima facie case, Mize must meet the definition of "disability" set forth under the ADA: (1) a physical

---

[4] The District Court for the Northern District of Alabama obtained this framework from McCoy v. Geico Gen. Ins. Co., 510 F.Supp.2d 739, 748 (M.D.Fla. 2007).

or mental impairment that substantially limits one or more major life activities; (2) a record of

such impairment; or (3) being regarded as having such impairment.  42 U.S.C. § 12102(1)  "An

individual is deemed to be 'disabled' for purposes of the ADA if he satisfies any one of these

three enumerated definitions."  Gordon, 100 F.3d at 911.  Neither party discusses the "record of"

or "regarded as" definitions of disability, thus the focus here will be on whether Mize has actual

disabilities.  The definition of an actual disability contains three elements, all of which Mize

must show.  Bragdon v. Abbott, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

First, she must have a recognized physical or mental impairment.  Second, she must identify one

or more "major life activities" affected by the impairment.  Third, she must show that the

impairment "substantially limits" one or more of these activities.  Rossbach v. City of Miami,

371 F.3d 1354, 1357 (11th Cir. 2004).  The first two elements are to be determined by this court

as a matter of law, whereas determining whether the impairment substantially limits a major life

activity is ordinarily a question of fact for the jury.  However, summary judgment may be

appropriate if Mize fails to create a genuine issue of fact in this regard.  Doebele v. Sprint/United

Mgmt. Co., 342 F.3d 1117, 1129 (10th Cir. 2003).

### a. Whether Mize suffers from a recognized physical impairment

The first element of actual disability - that Mize suffers from a recognized impairment -

is not met in this case as to Mize's alleged "night blindness."  Mize provided no medical

documentation establishing she suffers from this proposed infliction, and she provided no proof

that any other court has found "night blindness" is a recognized infliction under the ADA.  On

the other hand, based on the provided medical records (Doc. 18-3, Ex. 1) and Mize's testimony,

this court concludes the first element is met as to Mize's fibromyalgia, scoliosis, high blood

pressure, and asthma.  See Richards v. Publix Supermarket, Inc., 2007 WL 570090, at * 3

(M.D.Fla. Feb. 20, 2007).  Despite this court's conclusion, a physical impairment, standing

alone, does not necessarily make one "actually disabled" under the ADA.[5]  Hilburn, 181 F.3d at

1226; Pritchard, 92 F.3d at 1132).  Rather, the impairment must also substantially limit one or

more of the individual's major life activities. Gordon, 100 F.3d at 911; see Swain v.

Hillsborough County Sch. Bd., 146 F.3d 855, 858 (11th Cir. 1998)(a plaintiff "must provide

some evidence beyond the mere existence and impact of a physical impairment to survive

summary judgment.").

**b. Whether Mize has identified major life activities affected by a physical impairment**

To establish the second element of the definition of "actual disability," Mize must

identify the major life activities affected by her impairment.  "Major life activities" is defined by

the Equal Employment Opportunity Commission ("EEOC") regulations as "functions such as

caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing,

learning, and working."  29 C.F.R. § 1630.2(i).[6]  If one of Mize's activities is not contained

within one of these examples, the activity must be of "central importance to daily life."  Toyota

---

[5] The EEOC defines a physical impairment as follows:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respitory (including speech organs), cardiovascular, reproductive, digestive, genito-uniary, hemic and lymphatic, skin, and endocrine...

29 C.F.R. §1630.2(h).

[6] The Eleventh Circuit stated "[w]hile the ADA defines neither 'major life activities' nor 'substantially limits,' courts may rely on the regulations promulgated by the [EEOC] for guidance." Gordon, 100 F.3d at 911.

Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).[7]

Mize contends that the pain from her fibromyalgia, scoliosis, asthma, and high blood pressure "limits her sleeping, walking at length, climbing, cooking, house cleaning, turning quickly, heavy lifting, standing quickly[,] kneeling at length, [and] breathing normally."  (Doc. 18-1, p. 2; Doc. 18-4, Ex. 2).  At least two of these activities – walking and breathing – are examples of "major life activities" under the EEOC guidelines.  As a result, Mize has satisfied her burden under this second element by identifying major life activities which are affected by her fibromyalgia, scoliosis, high blood pressure, and asthma.

On the other hand, she has failed her burden under this second element as to her alleged "night blindness."  Even if her night blindness was a recognized impairment under the ADA, this "disability" does not affect a major life activity. Mize asserts that driving at night is the only activity which is affected by her alleged night blindness (See Doc. 14, Ex.A, Mize Dep., Ex. 4), and the Eleventh Circuit Court of Appeals has determined that the ability to drive is not a "major life activity" under the ADA.  See Chenoweth v. Hillsborough County, 250 F.3d 1328, 1329-30 (11th Cir. 2001).  As a matter of law, Mize is not able to establish the first prong of her prima facie case as to her "night blindness" since this affliction is not a recognized disability under the ADA.  Therefore, she is not able to assert a claim under the ADA for RBC's failure to provide

---

[7] The ADA was recently amended by the ADA Amendments Act of 2008 ("ADAAA"), which took effect on January 1, 2009, Pub.L. 110-325. In passing the ADAAA, Congress intended to "reinstate the broad scope of the protection to be available under the ADA," and explicitly overruled those cases that had "narrowed the broad scope of protection intended to be afforded by the ADA" and which had as a result, "eliminat[ed] protection for many individuals whom Congress intended to protect." Id. Specifically, the ADAAA overrules cases cited in this Order, including Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

her with an accommodation to attend the Christmas party on December 7, 2007.  Thus, summary judgment as to this particular claim is granted.

**c. Whether Mize has a physical impairment that substantially limits a major life activity**

In regards to the third element of the definition of "disability," "the EEOC has provided that courts should consider the following three factors when determining whether an impairment substantially limits a major life activity: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  Gordon, 100 F.3d at 911(citing 29 C.F.R. § 1630.2(j)(2); other citations omitted).  Mize contends that she has endured constant pain in her back, hands, arms, legs, and feet since the early to mid-1990s, and that she has not had a pain-free day since that time.  (Doc. 14, Ex.A, Mize Dep., pp. 59-60, 67-70).  In light of Mize's testimony and other evidence in the record, this court finds that reasonable persons in the exercise of impartial judgment could conclude that Mize's fibromyalgia, scoliosis, asthma, and high blood pressure substantially limit her ability to walk and breathe.  As a result, summary judgment based on the first prong of Mize's prima facie case is not appropriate at this time as to any of Mize's claims related to her fibromyalgia, scoliosis, asthma, and high blood pressure

### 2. Whether Mize is a qualified individual

Once a plaintiff satisfies the first prong of her prima facie case, she must then show that she is a qualified individual under the ADA.  "An individual is 'qualified' if she, with or without reasonable accommodation, can perform the essential functions and job requirements of the position the individual holds."  Earl, 207 F.3d at 1365(citing 42 U.S.C. § 12111(8); S.E. Cmty.

16

Coll. v. Davis, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979)).  RBC argues

that summary judgment is appropriate because Mize "cannot [] show that the accommodations

she requested were reasonable and would have allowed her to perform the essential functions of

her job."  (Doc. 14, p. 16).  Mize contends that she was denied a reasonable accommodation on

three occasions:[8] (1) when Mize asked to have another employee assigned part of her inventory

project; (2) when she asked to work at the basement teller window instead of the main level

teller desk; and (3) when she sent an email to Herman asking for a ride with or to follow

someone to the Christmas party.  Because Mize's night blindness is not a disability covered

under the ADA, it will only be necessary to discuss the first two alleged requests for

accommodation.

In general, "[a]n employer must provide reasonable accommodations for employees with

known disabilities unless such accommodations would result in undue hardship to the

employer."  Earl, 207 F.3d at 1365(citing Morisky v. Broward County, 80 F.3d 445, 447 (11th

Cir. 1996)).  Specifically, "[a]n accommodation is reasonable, and thus required under the ADA,

only if it allows the employee to perform the essential functions of the job."  Id.(citing LaChance

v. Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir. 1998)).  Mize "bears the burden of

identifying an accommodation, and of demonstrating that the accommodation allows [her] to

perform the job's essential functions."  Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255-6

(11th Cir. 2001)(citing Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286

---

[8] RBC states in its brief in support of its motion that Mize contends that she was denied a
reasonable accommodation on a fourth occasion: when Bettis and Hill declined to answer her
phone for her. (Doc. 14, p. 16). However, in her response, Mize maintains that this was not a
demand for an accommodation (Doc. 18-1, ¶ 6), thus this court will not treat it as such a request.

(11th Cir. 1997); <u>Willis v. Conopco, Inc.</u>, 108 F.3d 282, 283 (11th Cir. 1997)).  "The ADA lists

as examples of reasonable accommodations 'job restructuring, part-time or modified work

schedules, reassignment to a vacant position, acquisition or modification of equipment or

devices, ... and other similar accommodations for individuals with disabilities.'"  <u>Id.</u>(quoting 42

U.S.C. § 12111(9)(B)).

### a. Mize's request for a co-worker to help her with the inventory project

Before addressing whether Mize's request for help with her inventory project was a

request for a reasonable accommodation, the court must first determine whether the duty at issue,

inventorying the safety deposit boxes, was essential to performing the job of CAR.  First, the

statutory regulations state that the initial inquiry into whether a function is "essential" focuses on

whether the employer "actually requires employees in the position to perform the functions that

the employer asserts are essential."  29 C.F.R. § 1630.2(n); <u>see</u> <u>also</u> <u>Earl</u>, 207 F.3d at 1365.

Mize worked as a vault custodian for AmSouth prior to working for RBC, and once RBC took

over the Hillcrest Branch, Mize continued to perform the vault custodian duties, albeit under the

title of CAR.  (Doc. 14, Ex A, Mize Dep., pp. 220-1).  As a vault custodian with AmSouth, she

was required to perform an inventory of the safety deposit boxes.  (<u>Id.</u>, p. 262).  Therefore, the

bank, whether it is AmSouth or RBC, actually asks its employees to inventory the safety deposit

boxes from time to time.

Second, after determining that inventorying the vault is a function that RBC actually

requires of an employee, the court must then determine whether the job function is essential to

Mize's job as a CAR.  In ascertaining what job duties are essential, "the ADA states

'consideration shall be given to the employer's judgment...'"  <u>Earl</u>, 207 F.3d at 1365(citing 42

U.S.C. § 12111(8)).  Herman stated in her declaration that "Mize's vault inventorying task [was] an essential function of her job at RBC."  (Doc. 14, Ex. C, Herman Decl. ¶ 11).  In addition, "[a] job function also may be essential if there are a limited number of employees among whom performance of the job can be distributed."  Earl, 207 F.3d at 1365(citing 29 C.F.R. § 1630.2(n)(2)(ii)).  Herman stated in her declaration that Mize "worked in the safety deposit vault alone on a daily basis."  She also stated that "the other branch employees worked there virtually never" and that "the other employees, as far as I knew, had virtually no experience with its operation."  (Doc. 14, Ex. C, Herman Decl. ¶ 11).  Furthermore, Mize did not identify another employee capable of performing the vault inventory.[9]  (See Doc. 18-2, Mize Decl., ¶11).  This evidence clearly points to the fact that Mize was one of the few employees who could perform this inventory project.  Therefore, this court finds that Mize's inventorying task was an essential function of her job with RBC.

Third, in light of this court's finding that the inventory task was an essential function of the job, the next step for the court is determining whether Mize's request for an accommodation was reasonable.[10]  Prior to undertaking the inventory task, Mize asked Herman to provide

---

[9] Mize stated that Tiffany Denbow, who worked the teller window downstairs for AmSouth, occasionally had to "wait[] on the safe box customers" when Mize was gone.  She also asserted that when she went on vacation, "the tellers or the platform had to cover my position..." (Doc. 18-2, ¶11).  Despite the fact that Mize identified a specific employee who could wait on customers, Mize did not provide a name of an employee who had performed or could perform the vault inventory.

[10] Under the ADA, a "reasonable accommodation" includes:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a

another person to help her because she had trouble kneeling down and climbing a ladder.  (Doc. 14, Ex. A, Mize Dep., pp. 257-60).  Despite Mize's contentions to the contrary, courts have routinely found that requiring an employer to reassign an existing employee to help a disabled employee with an essential function of his or her job "is an unreasonable accommodation as a matter of law because it creates an undue burden on [the employer.]"  Merrell v. ICEE-USA Corp., 2000 WL 1854117, at *5 (10th Cir. Dec. 19, 2000); see e.g., Bratten v. SSI Servs., Inc. 185 F.3d 625, 632 (6th Cir. 1999); Soto-Ocasio v. Fed. Express Corp., 150 F.3d 14, 20 (1st Cir. 1998)(holding that requiring employer to allocate other employees to complete plaintiff's work is unreasonable); Henry v. Unified Sch. Dist. No. 503, 328 F.Supp.2d 1130, 1157 (D.Kan. 2004)("'The courts of appeals have consistently held that employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his or her disability); Johnson v. Ga. Dep't of Human Res., 983 F.Supp. 1464, 1474 (N.D.Ga. 1996)("An employer... is not required to reallocate essential job functions... For example, suppose a security guard position requires the individual who holds the job to inspect identification cards. An employer would not have to provide an individual who is legally blind with an assistant to look at the identification cards for the legally blind employee."); Dey v. Milwaukee Forge, 957 F.Supp. 1043, 1052 (E.D.Wis. 1996)(holding that ADA does not require employer to assign fellow workers to assist

---

vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)

plaintiff in performing his essential job functions because it involves a reallocation of plaintiff's job duties); Stubbs v. Marc Ctr., 950 F.Supp. 889, 895 (C.D.Ill. 1997)(requested accommodation of temporarily shifting duties to coworkers is unreasonable); Krennerich v. Inhabitants of Bristol, 943 F.Supp. 1345, 1351 (D.Me. 1996)("an employer is not 'required to assign existing employees... to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability.").

RBC is not required to reassign existing employees to assist Mize in her essential duties, and it is clear that Mize's proposed accommodation would do just that. Therefore, in regards to Mize's request for RBC to reassign an employee to help her with the inventory task, this court finds that a reasonable jury could not find that Mize's request was for a reasonable accommodation under the ADA.

### b. Mize's request to work the basement teller desk

In February 2008, Herman informed Mize that as part of her duties as CAR, she would need to fill in for the main level tellers from time to time. Mize in turn asked Herman for an accommodation that she be allowed to operate the downstairs basement teller desk instead of working on the main level, a request which Herman refused. There is no question that working as a teller is an essential function of Mize's CAR position. Herman stated in her declaration that forty percent of Mize's job as CAR would be spent "as a teller serving drive-thru and walk-in customers." (Doc. 14, Ex. C, Herman Decl., ¶ 3). Furthermore, Mize acknowledged that she would have to "function in the [t]eller capacity as required by [her] manager." (Doc. 14, Ex. A, Mize Dep., Ex. 7). Moreover, in her response to the motion for summary judgment, Mize did not object to RBC's assertion that the teller duties were an essential function of Mize's job as a

CAR.  (See Doc. 18-1, pp. 6-7; Doc. 18-2, Mize Decl., ¶¶ 3-6).

On the other hand, Mize does assert that her request to operate the downstairs teller desk instead of working on the main floor a request for a reasonable accommodation.  (Doc. 18-2, ¶6). This court disagrees. AmSouth had previously utilized the basement teller desk but that desk was taken out of service at least six months before RBC took over the Hillcrest Branch.  Once the takeover occurred, RBC did not reopen the basement teller desk.  (Doc. 14, Ex.A, Mize Dep., pp.242-4).  In light of the fact that a basement teller position did not exist at the time of Mize's request, Mize's proposed accommodation would require RBC to create a new position for Mize. However, "the ADA does not require an employer to promote a disabled employee as an accommodation, nor must an employer reassign the employee to an occupied position, nor must the employer create a new position to accommodate the disabled worker."  White v. York Int'l. Corp., 45 F.3d 357, 362 (10th Cir. 1995)(emphasis added); see also Johnson v. Cleveland City Sch., 2009 WL 2610833, at *7 (6th Cir. Aug. 25, 2009)("The ADA does not require the employer to create a new position for the plaintiff as an accommodation."); Terrell v. USAir, 132 F.3d 621, 624-26 (11th Cir. 1998)(where employer had no part-time positions available at time plaintiff demanded part-time schedule, a request for part-time employment was unreasonable); Baaqee v. Brock & Bleving Constr. Co., 2000 WL 821469, at *8 (S.D.Ala. June 19, 2000)("The ADA does not require an employer to reassign an employee to an occupied position, nor must the employer create a new position to accommodate the disabled worker.").

In light of the foregoing, the court finds that a reasonable jury could not find that Mize was a qualified individual under the ADA because of her inability to perform this essential function of her job with or without reasonable accommodation.

**3. Whether Mize was subject to unlawful discrimination on the basis of her disability**

Even if Mize had established that she suffers from a disability as defined under the ADA and had demonstrated that she is a qualified individual with a disability, Mize has still failed to show that a reasonable jury could find she was subject to unlawful discrimination on the basis of her disability.  First, Mize did not provide any evidence that she was terminated because of her disability. As stated above, working "in the [t]eller capacity as required by their manager" is an essential function of the CAR position.  (See Doc. 14, Ex. A, Mize Dep., Ex. 7; Ex.C., Herman Dec. ¶ 3).  Herman, as manager of the Hillcrest Branch, communicated to Mize that her job duties as CAR included working the main level teller area which included the drive-thru window.  (Doc. 18-2, Mize Decl., ¶ 5-6; Doc. 14, Ex. C, Herman Decl., ¶ 3, 5-6; Ex. A, Mize Depo., pp. 218-9).  Mize refused to work the main level teller area and instead gave Herman an ultimatum that she would only work as a teller in the downstairs teller window.  (Doc. 18-2, ¶ 6). As explained above, RBC was not required to open a new position for Mize, thus, on February 11, 2008, Herman gave Mize till February 15, 2008 to accept all the responsibilities of the CAR position, including working the main level teller area.  (Doc. 14, Ex. C, Herman Decl., ¶ 6). Mize did not accept that proposal by the deadline and was thereafter terminated.  (Id., ¶ 7).  In viewing the evidence in a light most favorable to the plaintiff, Mize was terminated because she would not accept the full responsibilities of the CAR position. With the evidence now before the court, a reasonable jury could not find that she was terminated because of her disability.

Second, Mize has not provided any persuasive evidence that she was denied her requested accommodation for the inventory project because of her disability.  On the other hand, Herman has given a valid business reason for her rejection of the accommodation.  Herman

"determined that there were no other personnel available that I could divert away from their normal jobs upstairs for a prolonged period of time in the basement."  Furthermore, Herman did offer Mize some help in that "some of the upstairs tellers could sort paperwork associated with the inventory during any 'down time' that they had between their interactions with customers." (Id., ¶ 10).

Third, Mize has not provided any persuasive evidence that RBC denied her request to work in the downstairs teller desk because of her disability.  As to the four reasons that Herman gave for not reopening the downstairs teller desk,[11] Mize only countered these reasons by asserting that those were not valid reasons, and she in no way asserted that the real reason she was denied her request was because of her disability.[12] (See Doc. 18-2, Mize Decl. ¶ 6).

---

[11] Herman stated she could not accept Mize's proposal for the following four reasons:

> First, I believe that any employee isolated in the basement with readily available cash would constitute a security and safety risk... Second, the basement does not have a drive-thru window, so it could not serve the bank's daily vehicles. Third, I did not think that Ms. Mize could be productive as a teller by working the basement teller desk... Fourth and finally, a general cost-benefit analysis dictated that the branch should not operate the basement teller desk.

> Doc. 14, Ex. C, Herman Decl., ¶ 6

[12] In response to Herman's reasons for denying the accommodation, Mize responded as follows:

> **First**, for 4 years I was isolated in the basement and readily received cash payments from safe box customers. I was in a small office easily accessed by anyone who came in the back door. Unlike the teller desk downstairs, which had two automatically locked doors and thick double paned glass.

> **Second**, the downstairs does not have a drive-thru window but it is much more conducive for handicapped people to access the bank...

> **Third**, I believe a simple sign inside and outside of the bank stating that there was

24

In light of the foregoing, Mize is not able to establish a <u>prima facie</u> case as a matter of law for (1) her claim that RBC failed to accept reasonable accommodations for her disabilities and (2) her claim that RBC terminated her because of those disabilities.  Therefore, summary judgment is due to be granted in favor of RBC as to Mize's ADA claim.

## C. <u>ADEA claim</u>

Mize also makes an age discrimination claim under the ADEA, 29 U.S.C. § 621 <u>et seq</u>. (Doc. 1).  Under the ADEA, it is "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  The <u>McDonnell Douglas</u> burden shifting framework is applicable in an ADEA case.  <u>See</u> <u>Cofield v. Goldkist, Inc.</u>, 267 F.3d 1264, 1268 n. 6 (11th Cir. 2001)("Although the <u>McDonnell Douglas</u> framework originally applied to Title VII cases, it is now widely accepted that the framework applies to claims of discrimination under the ADEA as well.")(citations omitted).  Therefore, "to succeed on a discrimination claim, a plaintiff must offer... circumstantial evidence that satisfies a four-part requirement for . . .  age discrimination: (1) that she was a member of a protected class; (2) that she was subject to an adverse employment action; (3) that the position she sought or was discharged from was filled by someone outside her protected class; and (4) that she was qualified to perform the job for which she was rejected."  <u>Turley v. SCI of Ala.</u>, 190 Fed.Appx. 844, 847 (11th Cir. 2006)(citing

---

another teller window downstairs would be all that was required to become a productive member of the teller team...

**Fourth**, and finally, the cost-benefit analysis is absurd...

(Doc. 18-2, Mize Decl., ¶ 6).

Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358-59 (11th Cir.

1999))(emphasis omitted)).

 If Mize is able to establish a prima facie case of age discrimination, the burden then shifts

to RBC, "who must 'proffer a legitimate, non-discriminatory reason for the adverse employment

action.'"   Hamilton v. Montgomery County Bd. of Educ., 122 F.Supp.2d 1273, 1280 (M.D.Ala.

2000)(quoting Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994)(internal

quotations omitted)).   The court is not able to determine whether plaintiff has made a prima

facie case of age discrimination, because she did not specifically respond to RBC's motion for

summary judgment on this ground.  Ordinarily, failure to respond to a motion for summary

judgment on a particular claim will be deemed a concession on that ground, or an abandonment

of that ground.

> In opposing a motion for summary judgment, "a party may not rely on his
> pleadings to avoid judgment against him." Ryan v. Int'l Union of Operating
> Eng'rs, Local 675, 794 F.2d 641, 643 (11th Cir.1986). There is no burden upon
> the district court to distill every potential argument that could be made based
> upon the materials before it on summary judgment. Blue Cross & Blue Shield v.
> Weitz, 913 F.2d 1544, 1550 (11th Cir.1990). Rather, the onus is upon the parties
> to formulate arguments; grounds alleged in the complaint but not relied upon in
> summary judgment are deemed abandoned. Road Sprinkler Fitters Local Union
> No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir.1994) (citing
> Lazzara v. Howard A. Esser, Inc., 802 F.2d 260, 269 (7th Cir.1986)), cert. denied,
> --- U.S. ----, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994).

Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir.1995).

 In this case, however, even if the plaintiff had successfully demonstrated a prima facie

case of age discrimination, there is no evidence pointed to by the plaintiff to show that the

legitimate, nondiscriminatory reasons proffered by RBC for plaintiff's termination, described

above, are pretextual, or merely a cover for discrimination because of her age.   "At the pretext

stage, in order to survive summary judgment, Plaintiff must provide sufficient evidence to allow a reasonable fact finder to conclude, at a minimum, that the proffered reasons were not actually the motivation for the employer's decision." Miller v. Bed, Bath & Beyond, Inc., 185 F.Supp.2d 1253, 1270 (N.D.Ala. 2002)(citing Combs v. Plantation Patterns, 106 F.3d 1519, 1539 (11th Cir. 1997)). Mize may do this by (1) "showing that the employer's legitimate nondiscriminatory reasons should not be believed; or" (2) "showing that, in light of all of the evidence, a discriminatory reason more likely motivated the decision." Id. (citations omitted).  "This is done by pointing to 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons... that a reasonable factfinder could find them unworthy of credence.'" Hamilton, 122 F.Supp.2d at 1281 (quoting Combs, 106 F.3d at 1539). The ultimate burden of persuasion remains with the plaintiff at all times in cases involving merely circumstantial evidence.  Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

        In satisfying the ultimate burden of proving that the discharge was on account of age, a plaintiff need not establish that age was the sole reason for termination, but that it was a determinative factor in the employer's decision.  Anderson v. Savage Labs., Inc., 675 F.2d 1221, 1224 (11th Cir. 1982)(citing Haring v. CPC Int'l, Inc., 664 F.2d 1234, 1239-40 (5th Cir. 1981)). However, it should be noted that federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)(quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)).  It is not appropriate for either the plaintiff or this court to "recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer." Id.  An

"employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1187 (11th Cir. 1984).  In her response, Mize failed to meet that burden of showing that RBC's legitimate nondiscriminatory reasons should not be believed or that an age discriminatory reason more likely motivated or influenced the decision. Therefore, the court finds that summary judgment is due to be granted in favor of RBC as to Mize's ADEA claim.

<b>CONCLUSION</b>

For the foregoing reasons, RBC's Motion for Summary Judgment (Doc. 13) is hereby **GRANTED**.   A separate judgment will be entered.

**DONE** and **ORDERED** this 21st day of October, 2009.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE